IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:24-cr-28-3 |
| | ) | |
| ANYELO JESUS MUINO AYALA, | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND MOTION FOR ACCEPTANCE OF RESPONSBILITY DECREASE

The United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, Kristen S. Taylor, Assistant U.S. Attorney, and Ben Tonkin, Trial Attorney, United States Department of Justice, Violent Crime & Racketeering Section, offers the following with respect to the sentencing factors under 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines ("USSG" or "guidelines") for defendant Anyelo Jesus Muino Ayala (hereinafter, "the defendant").

There are currently no outstanding objections to the defendant's Presentence Investigation Report.

The PSR's advisory guideline range is 63 to 78 months of imprisonment, resulting from a total offense level of 26 and a criminal history category of I. Final PSR ("PSR") ¶¶ 83-84. The government submits that a sentence at the low-end of the advisory guideline range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

I. **Procedural Background**

On April 17, 2024, the defendant was charged in a two-count Indictment charging him with Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, in violation of 18 U.S.C. § 1962(d), and Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(ii) and (h). PSR ¶ 1.

On December 11, 2024, the defendant pled guilty to Count one of the Indictment, pursuant to a plea agreement. PSR ¶ 2. As part of the plea agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the government agreed to recommend a sentence of imprisonment at the low-end of the advisory guideline range. Dkt. No. 182 at p. 3.

On February 25, 2025, the U.S. Probation Office ("USPO") filed the initial Pre-Sentence Investigation Report ("PSR"), which calculated the defendant's total offense level as 26 and his criminal history category as I, resulting in a guidelines range of 63-78 months. Dkt. No. 233.

On March 14, 2025, the government requested that the probation office supplement the initial PSR with additional information, including (1) the addition of nine defendants to the related cases section; and (2) information related to the defendant's 2023 narcotics arrest in Hollywood, Florida. Neither party advised of any objections to the PSR.

On March 24, 2025, the USPO disclosed the Final PSR (Dkt. No. 239), which included the requested related-case defendants and information related to the defendant's arrest. Dkt. No. 239 ¶¶ 13-21, 48. The government has no objections to the Final PSR.

II. **Motion to Grant the Defendant Additional One-Level Decrease for Acceptance of Responsibility**

The defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court

2

to allocate their resources efficiently. USSG § 3E1.1(b). The PSR has properly applied a two-level decrease in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and the defendant's offense level prior to the operation of that section is level 16 or greater. Accordingly, the United States moves this Court to apply an additional one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b). This reduction is already reflected in the PSR's offense level calculation. PSR ¶ 42.

### III.   Standards Governing Sentencing

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by either party. *Id*. (citing *Gall*, 552 U.S. at 49). The court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50). After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. The Fourth Circuit has also held that "a sentencing court must address the parties' nonfrivolous arguments in favor of a particular sentence, and if the court rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to

conduct a meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017). The Fourth Circuit considers "[a] within-Guidelines range sentence [] presumptively reasonable." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

### IV. The Statutory Sentencing Factors

A. <u>The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

The defendant was a member of a criminal enterprise that engaged in gas pump skimming operations throughout the United States. PSR ¶ 22. Gas pump skimming operations include but are not limited to scouting locations for installation of skimming devices, monitoring skimming devices, retrieving track data from skimming devices, creating cloned credit and debit cards using track data from skimming devices, cash out operations, and using fences to exchange illicit goods for cash. *See id*. The defendant was a member of the enterprise beginning in or about 2018 and continuing through in or about June 2019. *See id*. While a member of the enterprise, the defendant took several trips to conduct skimming operations as defined above. *See id*. Some of these trips are outlined in the 25 overt acts highlighted in the defendant's statement of facts.

These overt acts illustrate the wide range of the defendant's involvement in the activities of the enterprise. For example, the defendant traveled from Miami to various locations, including San Francisco, Seattle, Los Angeles, and Chicago to conduct skimming operations. *See id*. He and his co-conspirators used cell phones and other electronic devices to search for businesses where they could conduct cash out operations and drove around scouting locations to install skimming devices on gas pumps. *See id*. The defendant and his co-conspirators used cloned cards to conduct cash out operations, and then transported fraudulently obtained gift cards, cash, and other goods over state lines back to Miami. *See id*. The defendant also received stolen track data using his own e-mail account. *See id*. This conduct was repeated over and over again during the course of

4

approximately one year. During this one-year period, the enterprise flourished. Approximately $6.87 million in losses are attributed to the defendant based on approximately 13,747 unique card numbers traded among e-mail accounts attributable to the enterprise during that time frame.

While records of the enterprise's travel, internet searches, and email correspondence provide a broad overview of their conduct, a closer look at the group's conduct on the Eastern Shore provides a more detailed view of the damage the defendant and his coconspirators caused. In April 2018, law enforcement located and retrieved skimming devices placed by members of the enterprise at two gas pumps in Northampton County. The investigation revealed that from April 21, 2019 to April 22, 2018, the defendant and hit coconspirators hit at least 19 different locations, mostly Harris Teeter grocery stores, to use the cloned credit cards they had created. In that short period of time, the defendant and his co-conspirators generated over $100,000 in actual/attempted loss, typically by purchasing $500 gift cards or making cash-back transactions of hundreds of dollars. *See* Government Exhibit 1.

Therefore, the nature and circumstances of the defendant's offense, as well as the substantial level of the defendant's involvement in a wide variety of conduct facilitated by the enterprise demands a substantial sentence.

B. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant is 27 years old and was born in Havana, Cuba, where he lived until he was 13 years old. PSR ¶ 50. He moved with his family to Hialeah, Florida, where he lived from the ages of 13 to 18. PSR ¶¶ 51-52. The defendant graduated from Hialeah Senior High School in 2014 or 2015, where he played on the baseball team. PSR ¶¶ 54, 72. The defendant became a naturalized United States Citizen in 2010. PSR ¶ 55.

The defendant's family experienced some hardship in Cuba prior to relocating to the United States. PSR ¶ 51. It is apparent that the defendant's family did all they could to provide for him and his sibling. They moved to the United States to seek better employment and educational opportunities for their children and hired a tutor to teach the defendant English to help facilitate his transition from Cuba to the United States. PSR ¶ 52.

After graduating high school, the defendant earned unreported income as a barber from 2014 to 2021 or 2022. PSR ¶ 80. In 2021 or 2022, the defendant spent approximately 6-12 months driving a dump truck and framing houses. PSR ¶ 79. For approximately two years, beginning in or about 2022 through in or about 2024, the defendant reports that he was a truck driver for two separate companies. PSR ¶¶ 76-77. His employment with the second company terminated due to his arrest for the instant offense. PSR ¶ 77.

The defendant reported substance abuse issues, including using cocaine daily and ecstasy 2-3 times per week as an adult. PSR ¶¶ 65-71. He was admitted to inpatient substance abuse rehabilitation facilities on three separate occasions in 2018, 2019, and 2020. PSR ¶¶ 68-71. The records further reflect that the defendant has suffered from some mental health issues, specifically related to substance abuse. PSR ¶ 71.

The PSR reflects a criminal history score of zero, resulting in a Criminal History Category I. PSR ¶ 46. Accordingly, the defendant technically meets the criteria for a two-level reduction pursuant to U.S.S.G. USSG §§ 4C1.1(a)(1)-(10). PSR ¶ 40.

That said, while the defendant has no prior *convictions* at this time, this Court should consider that his record is by no means devoid of criminal conduct and/or meaningful contact with law enforcement. Notably, in May 2023, the defendant was stopped by police and arrested for narcotics possession. PSR ¶ 48; *see also* Government Exhibit 2. This matter is still pending in

6

Broward County Superior Court. PSR ¶ 48. Since his arrest and detention in the instant matter, four motions to continue have been granted in Broward County. *See* Government Exhibit 3. Once the instant matter is resolved, the Broward County case will be adjudicated and based on the circumstances of the pending offense, it is likely that the defendant will no longer be a true zero-point offender. This is significant primarily because criminal history has a direct correlation with risk of recidivism. The Sentencing Commission examined the relationship between rearrests and the total number of criminal history points and confirmed that offenders with more extensive criminal histories had higher rearrest rates. *See Recidivism of Federal Offenders Released in 2010* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (hereinafter, "Recidivism Report") at pp. 25-28.

> In its 2016 Recidivism Overview Report and its 2017 Recidivism Criminal History Report, the Commission reported the lowest recidivism rates among offenders with zero criminal history points (30.2%), a sharp increase for offenders with one criminal history point (46.9%), and a generally steady increase in recidivism with each additional criminal history point.

Recidivism Report at p. 27, n. 72 (citing 2016 Recidivism Overview Report, supra note 3, at 18; 2017 Recidivism Criminal History Report, supra note 8, at 7). Also, notably, "one-fifth (20.3%) of zero-point offenders with no prior contact with the criminal justice system were rearrested during the study period." *Id* at p. 28. "In comparison, nearly one-third (32.7%) of zero-point offenders with prior contact were rearrested." *Id*. All this suggests that prior contact with law enforcement matters when it comes to evaluating the likelihood of recidivism.

The defendant's history and characteristics, therefore, support the government's sentencing recommendation. The defendant's family left Cuba and moved to the United States to afford the defendant with educational and employment opportunities, and instead, he's largely unreported

7

his income and squandered those opportunities committing large scale fraud at the great expense of law-abiding citizens.

C. <u>The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))</u>

The sentence imposed must adequately capture the seriousness of the offense conduct in this case, promote respect for the law, and provide just punishment. To do so, this Court must consider the impact the criminal enterprise, of which the defendant was an active and thriving member, had on law-abiding citizens throughout this district and all over the country. The enterprise charged in this case employed sophisticated tactics that enabled them to systematically and covertly steal from thousands of unwitting individual victims pumping gas in their hometowns or traveling interstate.

This Court should consider the effect of one's identity being compromised on an individual victim, let alone thousands of victims over a sustained period of time. The enterprise charged in this case made a living at others' great expense. Furthermore, the way in which the enterprise operated made them very difficult to detect by local law enforcement agencies, which explains why it took a federal RICO prosecution to capture the nationwide scope of its conduct. This also means that the conduct captured by this case is largely historical, which makes identifying individual victims for purposes of restitution at best very difficult, and at worst, impossible. The defendant and his co-conspirators' sentences must account for these considerations.

D. <u>The Need to Afford Adequate Deterrence & to Protect the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(B), (C))</u>

General deterrence should be a significant factor for this Court's consideration in this case. The large-scale theft of individuals' personally identifiable information through gas pump skimming is an ongoing problem throughout the country, and the prevalence of credit card fraud and its impact on both individual victims and financial institutions cannot be overstated. Sixty-two

8

percent of credit card holders have been victimized by fraud, with annual losses exceeding $6.2 billion annually. *See* Brett Cruz, *2025 Credit Card Fraud Report and Statistics*, Jan. 27, 2025, https://www.security.org/digital-safety/credit-card-fraud-report/. Yet, fraudsters like the defendant often go unpunished: only 10 percent of fraudulent charges are actually reported to law enforcement. *See id.* As discussed above, this type of conduct largely goes unadjudicated, in part, because the actors move in and out of locations quickly to avoid detection by law enforcement, making it very difficult for local law enforcement agencies to make victims whole. This defendant's sentence must be substantial enough to send a message to those engaged in similar conduct that if caught, the penalties will be severe.

And while general deterrence should be a primary concern, it does appear, based on the defendant's history and the information discussed above, that specific deterrence should be considered as a factor for this Court in determining a sentence as well.

E. The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

The available statutory sentence for Count One, a violation of 18 U.S.C. § 1962(d), is up to 20 years of imprisonment. *See* 18 U.S.C. § 1963(a). A sentence of probation is not authorized by the guidelines but is statutorily authorized for not less than one and up to five years. 18 U.S.C. § 3561(c)(1). A term of supervised release may be imposed for up to three years. 18 U.S.C. § 3583(b)(2).

F. The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(6))

The government is requesting a sentence within the advisory guidelines range, which would serve to avoid unwarranted disparities with similarly situated defendants. *See United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" (quoting *United States v. Zapata*, 546 F.3d

9

1179, 1194 (10th Cir. 2008))); *United States v. Parks*, Criminal Action No. 5:05-CR-00257-KDB-DCK, 2020 WL 6826214, at *3 (W.D.N.C. Nov. 20, 2020) ("One of the goals of the Sentencing Guidelines is to avoid national sentencing disparities amongst similar offenders with similar criminal conduct. *See, e.g.*, *United States v. Johnson*, 445 F.3d 339, 343 (4th Cir. 2006). Thus, the best way to avoid unwarranted sentencing disparities is for the district court to impose a sentence within the guidelines range.").

As reflected in the PSR, nine individuals were previously convicted of Conspiracy to Commit Bank Fraud in a related matter. *See US v. Pedro Duran, et al*., 2:19-cr-109; PSR ¶¶ 13-21. This related matter involved members of the same criminal organization who traveled to the Eastern District of Virginia in or about April 2018 to conduct a skimming operation. The defendant was not charged in 2019 with his co-conspirators because law enforcement could not, at the time, confirm his participation in the skimming activity that took place here. As the investigation evolved, law enforcement learned that he was, in fact, part of the skimming operation here in the Eastern District of Virginia and his statement of facts ¶¶32-42 reflect his substantial participation in that activity and the individual victims his actions compromised.

The individuals who pled guilty in the previous were charged with approximately one months' worth of skimming activity. Unfortunately, at that time, law enforcement was unaware of the far-reaching scope of the organization's activities. Despite spending only a short time here in EDVA in April 2018, the defendant and his co-conspirators charged in *US v. Duran et al.* managed to generate a significant amount of loss, ranging from approximately $245,000 to $570,000, depending on each individual defendant's involvement. The nature of the previous investigation also enabled law enforcement to tie specific transactions using victims' PII to individual defendants, making it much easier to reliably calculate loss.

Yasmani Qujiada, one of the enterprise's leaders, was also convicted and sentenced to a total of 10 years' incarceration in the previous case. He was attributed with over $5,000,000 in loss, based on calculations from individual victims from the EDVA skimming trip and over 9,000 unique card numbers identified in an e-mail account that was associated with him. Notably, the previous investigation included seizures of at least two laptops – one containing 642 unique access devices (totaling $321,000 in losses) and one containing 212 unique access devices (totaling $106,000 in losses).

The significant takeaway from the previous investigation is that the losses in the instant case are very conservatively calculated. The previous case was a snapshot of the damage this organization could do in one location over a short period of time. That said, the sentences imposed in the previous case, despite being based on only one skimming trip, were in most instances fairly significant given their advisory guideline ranges and the loss amounts attributable to them.

This case, on the other hand, captures the entirety of this organization's conduct. A RICO conspiracy is designed to punish not only the individual acts of racketeering charged, but the existence of organized criminal activity. "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). Thus, organized crime poses a significant threat to our community, not just physically, but financially. Here, additional investigation has revealed that the scope of the enterprise was much larger than previously known. During the defendant's tenure, the enterprise transmitted over 13,000 unique set of stolen card data. The sentences imposed for members of this enterprise engaged in organized financial crime, the consequences of which were nationwide, must

adequately capture the scope of their conduct. Therefore, given these considerations, a low-end guideline sentence for this defendant is more than reasonable.

G. The Need to Provide Restitution (18 U.S.C. § 3553(a)(7))

In the plea agreement, the defendant agreed that restitution was mandatory, and to the entry of a restitution order in the full amount of the victim's losses. Dkt. No. 182, at ¶ 10. Furthermore, as part of the plea agreement entered in this case, the defendant agreed that the Court may defer the imposition of restitution until after sentencing and specifically waives the 90-day provision found at Section 3664(d)(5) and consents to the entry of any orders pertaining to restitution after sentencing without limitation. *See id*. To-date the government is still working with victim-witness services to identify victims and finalize figures attributable to the conduct committed by the defendant and his co-conspirators, not otherwise accounted for by previous Restitution Orders entered in related cases.

Therefore, the government requests that the Court bifurcate restitution in this matter pursuant to 18 U.S.C. § 3664(d)(5), which allows restitution to take place within 90 days after the sentencing hearing. If the Court grants this request, the government further requests that this Court address at the sentencing hearing whether the defendant will waive his presence at any subsequent proceeding(s) regarding restitution. If he does not, then the government would request that he remain in local custody and not be transferred to the BOP until restitution is finalized.

**V. Supervised Release Conditions**

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d). In addition to an oral pronouncement of the

12

individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR. *Rogers*, 961 F.3d at 299. Here, the U.S. Probation Office has outlined its recommended supervised release conditions on pages 20 through 23 of the PSR, including mandatory, standard, and special conditions. In addition to those conditions, the government requests a condition prohibiting the defendant from obtaining employment where he would have access to the PII of others.

**VI.   Conclusion**

For the reasons stated above, the government submits that a sentence at the low-end of the advisory guideline range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Erik S. Siebert
United States Attorney

By:  _____/s/_____
Kristen S. Taylor
Assistant United States Attorney
Pennsylvania State Bar No. 326039
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6331
Fax - 757-441-6689
E-mail Address – Kristen.taylor2@usdoj.gov

_____/s/_____
Ben Tonkin
Trial Attorney
Violent Crime & Racketeering Section
U.S. Department of Justice
Washington, DC 20530
Tel. - 202-514-3594
E-mail Address – Ben.Tonkin@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record who are users of the CM/ECF system.

I further certify that on March 27, 2025, I will send an electronic copy of the foregoing to the following:

Joshua Coleman
Senior United States Probation Officer

/s/
Kristen S. Taylor
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6331
Fax - 757-441-6689
E-mail Address – Kristen.taylor2@usdoj.gov